UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE MARTINEZ,

       Petitioner,

    v.

G. E. LEWIS,

       Respondent.[1]

Case No.  13-cv-05742-CW (PR)

ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS; DENYING
CERTIFICATE OF APPEALABILITY

Petitioner Jose Martinez, a state prisoner proceeding pro se, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state criminal conviction, asserting that his constitutional rights were violated when the trial court instructed the jury with an invalid theory of felony-murder.  For the reasons discussed below, the Court DENIES the petition and a certificate of appealability.

BACKGROUND

I. Procedural History

In 2010, a Contra Costa County jury found Petitioner guilty of: count one, the second degree murder of Jose Mendoza-Lopez, finding true the allegations that Petitioner committed the crime for the benefit of a criminal street gang and that the principal in the offense used and intentionally discharged a firearm; count two, conspiracy to commit aggravated assault,[2] finding true the

---

[1] In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Warden Clark E. Ducart as Respondent because he is Petitioner's current custodian.

[2] The jury failed to make a finding on whether the purpose of the conspiracy was to commit an aggravated assault or to commit

allegation that the conspiracy was committed to benefit a street gang; and count three, conspiracy to participate in a criminal street gang.  7 Clerk's Transcript (CT) 1864-84.  The trial court sentenced Petitioner to sixty years in state prison.  7 CT 1956-61.

On January 11, 2013, the California Court of Appeal affirmed Petitioner's conviction and, on February 11, 2013, it modified its opinion upon denial of rehearing.  Ex. 9; People v. Martinez, 2013 WL 136183 (Cal. Ct. App.)(unpublished).  On April 17, 2013, the California Supreme Court denied review.  Exs. 10, 11. Petitioner timely filed this federal petition for a writ of habeas corpus.  Respondent has filed an answer; Petitioner has not filed a traverse.

II. Statement of Facts

Petitioner and two others were charged with seven counts, comprising five counts of murder, conspiracy to commit murder and aggravated assault, and engaging in a criminal street gang conspiracy.  Martinez, 2013 WL 13182, at *1.  One co-defendant plead guilty in return for testifying against Petitioner and the other fled and remained at large.  Id.  The jury acquitted Petitioner of the four murders alleged in counts four through seven and made no findings on the gang allegations related to those counts.  Id. at n.2.

The California Court of Appeal summarized the evidence relevant to the murder of Mendoza-Lopez, as follows:

murder.  The trial court subsequently found that the purpose of the conspiracy in counts two and three was to commit the lesser crime of aggravated assault.  7 CT 1956.

United States District Court
Northern District of California

United States District Court
Northern District of California

Diana Salazar, who knew Mendoza-Lopez, testified to the following.  On January 26, 2008, a group of friends and acquaintances, including Salazar and Mendoza-Lopez, celebrated the birthday of Juan Ayala at his house.  Id. at *2.  Nobody in this group, including Mendoza-Lopez, was involved in a street gang.  Mendoza-Lopez wore shoes and a hat that were red or partially red.  Id.

Later, eight of these people drove to a friends' party at a San Pablo apartment.  Id.  A few of them went inside and Salazar, Mayra Lainez, Noel Castro, Luis Anaya and Mendoza-Lopez stayed outside.  Id.  Several men inside looked like gang members and were dressed in blue and wore hoodies and baggie jeans.  Id.

Lainez testified that, after being outside about three to five minutes, a man walked toward them with a gun.  Id.  The man was wearing a hoodie and a beanie.  Id.  The man pulled a gun from the front center pocket of his hoodie and shot Mendoza-Lopez four to five times, and then said, "RST on me," in good English.  Lainez was standing next to the victim and was within eleven feet of the gunman.  Id.

Anaya testified to the following:  He saw six people come out of the apartment toward them.  Id.  They said, "Southside RSTs," and then one pulled a gun from his black hooded sweatshirt and started shooting.  Id.  The shooter was short, about five feet, four inches or five feet, five inches in height.  Id.  Petitioner stood next to Fernando Garcia (aka Danger), both wore sweatshirts, and they generally resembled each other.  Id.  Both were approximately five feet, six inches tall.  Id.; Id. at *4 n.3.  Anaya was not sure who fired the gun.  Id.  Anaya saw

3

1  Mendoza-Lopez get shot and fall down.  Id.  He ran inside the

2  apartment after the third shot.  Id.  When he went back outside,

3  the shooter's friends started hitting him.  Id.

4      Salazar's testimony continued as follows:  She had just

5  taken half a step into the apartment when she heard three or four

6  gunshots.  Id.  She turned and saw Mendoza-Lopez falling.  Id.

7  She saw Maria Vargas run out of the apartment and argue with the

8  shooter.  Id.  Salazar did not see the shooting, but she thought

9  Garcia was the shooter because of his gestures and because he

10  said, in English, "RST on mine" and Mendoza-Lopez was wearing the

11  wrong color.  Id.  Salazar heard Vargas ask Garcia why he "did

12  what he did," and Garcia responded that "he was wearing the wrong

13  color on the wrong block and that it was RST on his."  Id.  She

14  saw Garcia make a gesture, like he was covering the gun, then saw

15  him put the hoody on, turn around and run off.  Id.

16      Salazar understood the man clearly.  He was speaking in

17  English, and she speaks English and Spanish.  Id.  She did not

18  recall Spanish being spoken.  Id.  Salazar did not see a gun in

19  the man's hand, just a gesture to indicate that he had hidden it

20  in his pants.  Id.  He was five feet, nine inches tall, light-

21  skinned, had short hair, and was in his early twenties.  Id.

22      Petitioner's friend, Ingrid Martinez, testified to the

23  following:  She used to hang out with Sureno gang members

24  including Petitioner, who was called Cobra, Fernando Garcia, who

25  was called Danger, and Victor Cervantes, who was called Creeper.

26  Id. at *3.  Petitioner was a member of the gang called "SSL," the

27  Southside Locos.  Id.  Petitioner spoke Spanish and only a few

28  words in English.  Id.  On January 26, 2008, Martinez was

4

United States District Court
Northern District of California

1  upstairs at the San Pablo party.  Id.  Petitioner came upstairs
2  and told the other men that someone was wearing red downstairs.
3  Id.  Everyone went downstairs where Petitioner, Garcia and
4  Cervantes "claimed their Sureno gangs."  Id.  Mendoza-Lopez, who
5  was downstairs with Ayala and Castro, told Garcia, "I need to
6  talk to you."  Id.  Martinez tried to tell Petitioner and Garcia
7  that the people downstairs were not Nortenos, that they were
8  nothing.  Id.  Garcia said, "Okay."  Id.  And then "they shot."
9  Id.  Just before the shooting, Martinez heard, "RST on me," or,
10 "RST on Mine," in English.  Id.  She saw Petitioner shoot
11 Mendoza-Lopez and heard three gunshots.  Id.  She did not see
12 Garcia with a gun.  Id.

13     After the shooting, everyone ran.  Id.  Martinez spent the
14 night at Garcia's house.  Id.  In the morning, she learned that
15 the police were at her house.  Id.  Martinez called Petitioner,
16 told him the police were at her house and asked, "why did he do
17 that in front of all that people and putting me into this."  Id.
18 Petitioner said he was sorry but told her not to say anything.
19 Id.  Martinez gave a statement to the police, but was scared and
20 tried not to "snitch."  Id.  She went to Mexico for a year, came
21 back, and then moved out of state.  Id.  She was certain that
22 Petitioner shot Mendoza-Lopez.  Id.

23     Frank R. testified to the following.  He had known
24 Petitioner since 2006.  Id.  After the shooting, he went to
25 Garcia's house, where he saw Petitioner.  Id.  Petitioner had a
26 gun in his waistband.  Id.  Petitioner said that he killed the
27 victim because he was disrespecting him and because he was
28 wearing red.  Id.  When Frank R. asked Petitioner what happened,

5

Petitioner said he "fired some shots to this guy." Id. The next day, Petitioner called Frank R. and asked for a ride. Id. Petitioner told him the police had picked up Martinez and that he had told her that if she said anything, she would pay for it. Id. at *4.

Frank R. was arrested and charged with Petitioner for five homicides and two counts of conspiracy. Id. In return for testifying, Frank R. was allowed to plead guilty in juvenile court for being an accessory after the fact. Id. He entered witness protection and testified under a grant of immunity. Id.

Victor Cervantes testified to the following. On January 26, 2008, he was at the party with Petitioner and others. Id. The party was "weird" because three gangs were hanging out together. Id. Petitioner came running upstairs as if there were something exciting happening and said in Spanish that "there were some busters downstairs." Id. Petitioner, Garcia and two other people ran downstairs. Id. Cervantes walked downstairs and heard Garcia arguing with Mendoza-Lopez, saying he had told him not to wear red in Richmond. Id. He heard Garcia say in English, "I already told you about wearing all the red in Richmond." Id. Cervantes saw Garcia and Petitioner facing Mendoza-Lopez and arguing with him. Id. Both Garcia and Petitioner were wearing black hoodies and blue jeans. Id. Garcia was on the right-hand side; Petitioner was on the left. Id. Cervantes heard three gunshots. Id. Cervantes could not see who had the gun when he heard the gunshots. Id. He testified that the person on the left had the gun; that person was Petitioner. Id. He admitted that he might have told police

the positions were reversed, that is, that Garcia was on the left and Petitioner on the right. <u>Id.</u>

On January 27, 2008, Mayra Lainez was interviewed by police and shown a photographic lineup. <u>Id.</u> She identified Petitioner as the shooter, but could not remember the faces of the others who were with him. <u>Id.</u> Lainez told police that she had known Mendoza-Lopez for two years and did not know him to be a gang member or to have friends who were gang members. <u>Id.</u> She initially described the shooter to police as being five feet, ten inches. At trial she stated that she was sure Petitioner was the shooter. <u>Id.</u> at *5. But, on cross-examination, after seeing that Petitioner was shorter than her estimate, she was no longer positive he was the shooter. <u>Id.</u>

On January 28, 2008, officers conducted more photographic lineups. <u>Id.</u> Vargas did not identify anyone. <u>Id.</u> Salazar identified Petitioner as the shooter. <u>Id.</u> Anaya at first testified that he could not see the shooter's face, but then he identified Petitioner as the shooter. <u>Id.</u> Anaya explained that Petitioner and Garcia both wore sweaters and stated that he did not know which of the two men was the shooter. <u>Id.</u>

Petitioner was arrested on January 31, 2008. <u>Id.</u> From his bedroom, police recovered a baggie containing six live .357 magnum handgun rounds, three pairs of baggy blue jeans, a blue and white striped shirt, two large black hooded sweatshirts, and a jersey with the number 13. <u>Id.</u> From Petitioner's vehicle, police recovered several photographs of Petitioner wearing blue, holding various firearms, and making or "throwing a three" with his hand. <u>Id.</u>

United States District Court
Northern District of California

1    Forensics evidence showed that Mendoza-Lopez died from two

2    bullet wounds from shots fired from a distance of no more than

3    two feet.  Id.

4    Lucila Navarro testified about Petitioner's prior uncharged

5    conduct.  Id. at *6.  On May 6, 2007, Navarro was with a group of

6    friends at Keller Beach.  Id.  A group of six to eight men,

7    mostly wearing blue, jumped her brother Francisco, screaming "Sur

8    Trece."  Id.  One of them hit Francisco in the head with a

9    bottle, and Francisco fell to the ground, unconscious.  Id.

10    Navarro identified Petitioner as one of the assailants.  Id.

11    Petitioner was wearing blue and had "SS" and X3" tattoos on his

12    shoulders.  Id.  Petitioner punched and kicked her brother and

13    threw a beer bottle at him.  Id.  When Francisco was on the

14    ground unconscious, Petitioner repeatedly kicked him.  Id.

15    After the Keller Beach incident, when Petitioner was

16    arrested, he identified himself as a Mexican Locos and Southside

17    Locos gang member.  Id.

18    The defense case consisted of the testimony of Dr. Scott

19    Fraser, an expert in eyewitness identification.  Id.  Fraser

20    testified as follows:  People who are certain in their

21    identification are just as likely to be correct or incorrect as

22    those who say they are fifty or seventy-five percent certain.

23    Id.  Thus, confidence is not a good predictor of accuracy.  Id.

24    When a person experiences a stressful event, such as seeing a

25    weapon, blood flow to the brain decreases and less information is

26    processed.  Id.  Seeing a gun increases stress and distracts a

27    person's attention, reducing the accuracy of correct recognition.

28    Id.  Errors in identification also can occur through a process

8

known as conscious transference, whereby a person misidentifies an individual as someone he or she has seen before.  Id.

As noted above, the jury convicted Petitioner of count one, second degree murder of Mendoza-Lopez, and found true that the crime was committed for the benefit of a criminal street gang and that a principal in the offense used and intentionally discharged a firearm causing the victim's death.  Id.  The jury found not true that Petitioner personally and intentionally discharged the firearm.  Id.  The jury also convicted Petitioner of count two, conspiracy to commit murder and to commit aggravated assault; the verdict form did not require the jury to specify either crime as the object of the conspiracy and, therefore, the trial court found that the object of the conspiracy was the lesser crime of aggravated assault.  Id.  The jury found true two of the eighteen overt acts alleged, both of which related to the killing of Mendoza-Lopez, and found true that the conspiracy was to benefit a criminal street gang.  Id.  The jury also convicted Petitioner of count three, conspiracy to participate in a criminal street gang.  Id.  The court found the allegation of Petitioner's prior conviction true and deemed it a serious felony and a strike prior.  Id. at *7.

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim:

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A federal court on habeas review may not issue a writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ.  Id. at 409.  The factual determinations by state courts are presumed correct unless there is "clear and convincing evidence to the contrary."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present case, the California Court of Appeal is the highest court that addressed Petitioner's claims in a reasoned opinion.

10

DISCUSSION

In support of his petition for a writ of habeas corpus, Petitioner claims that his right to due process was violated when the trial court instructed the jury on an invalid theory of second-degree felony murder in which the underlying felonies were assault and conspiracy to commit assault. Respondent concedes here, as he did in the Court of Appeal, that the trial court erred by instructing the jury on felony murder based on assault. Respondent argues, however, that the state courts' rejection of this claim, by finding that the erroneous jury instruction was not prejudicial, was objectively reasonable and, alternatively, that the error was not prejudicial under the federal standard set forth in Brecht, 507 U.S. at 623.

I. State Court Opinion

The state court explained that, based on two California Supreme Court cases, People v. Ireland, 70 Cal. 2d 522 (1969), and People v. Chun, 45 Cal. 4th 1172 (2009), the felony murder instruction was erroneous, as follows:

> In Ireland, supra, 70 Cal. 2d 522, our Supreme Court concluded that assault with a deadly weapon cannot serve as the predicate felony for purposes of the felony murder rule. The court adopted a merger rule that limited the application of second degree felony murder where the underlying felony was "an integral part of the homicide." (Id. at 539.) The court explained: "To allow ... use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law." (Ibid.)
>
> In Chun, supra, 45 Cal. 4th at 1189, 1200,

the court acknowledged that inconsistencies had emerged in its prior holdings based on Ireland.  The court reconsidered those cases and adopted a simplified test for application of the merger doctrine in a second degree felony murder situation: "When the underlying felony is assaultive in nature, such as a violation of section 246 or 246.3, we now conclude that the felony merges with the homicide and cannot be the basis of a felony-murder instruction.  An 'assaultive' felony is one that involves a threat of immediate violent injury.  In determining whether a crime merges, the court looks to its elements and not the facts of the case.  Accordingly, if the elements of the crime have an assaultive aspect, the crime merges with the underlying homicide even if the elements also include conduct that is not assaultive." (Chun at 1200.)

Here, based on Ireland and Chun, appellant contends the trial court gave three erroneous instructions to the jury.  First, he challenges the court's instruction on second degree felony murder based on aiding and abetting: "If a human being is killed by any one of several persons engaged in the commission of the crime of assault with force likely to produce great bodily injury and/or assault with a deadly weapon, felonies inherently dangerous to human life, all persons who either directly and actively commit the act constituting one of those crimes or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging or facilitating the commission of the offense, aid, promote, encourage or instigate by act or advice its commission are guilty of murder of the second degree, whether the killing is intentional, unintentional or accidental."  (CALJIC No. 8.34, emphasis added.)

Second, he challenges the court's instruction defining murder, which included assault with force likely to produce great bodily injury and assault with a deadly weapon as inherently dangerous felonies: "The defendant is accused in Counts 1, 4, 5, 6 and 7 of having committed the crime of murder, a violation of Penal Code Section 187.  Every person who unlawfully kills a human being with malice aforethought or during the commission or attempted commission of a

felony inherently dangerous to human life is
guilty of the crime of murder in violation of
Penal Code Section 187.  In order to prove
this crime, each of the following elements
must be proved: One, a human being was
killed; two, the killing was unlawful; three,
the killing was done with malice aforethought
or occurred during the commission of a felony
inherently dangerous to human life which was
perpetrated by someone other than the
defendant.  <u>Assault with force likely to
produce great bodily injury and assault with
a deadly weapon are felonies inherently
dangerous to human life</u>."  (CALJIC No. 8.10,
emphasis added.)

Third, he challenges the court's instruction
regarding second degree felony murder based
on conspiracy: "If two or more persons
conspired together to commit a felony
inherently dangerous to human life, namely,
<u>assault with force likely to produce great
bodily injury and assault with a deadly
weapon</u>, and if the life of another person is
taken by one or more of them in furtherance
of the common design and if that killing is
done to further that common purpose or is the
natural and probable consequence of the
pursuit of that purpose, all of the co-
conspirators are equally guilty of murder of
the second degree, whether the killing is
intentional, unintentional or accidental."
FN4 (CALJIC No. 8.33, emphasis added.)

> FN4  This instruction erroneously stated
> that the killing had to be in
> furtherance of the conspiracy to assault
> or a natural and probable consequence of
> the common plan or design of the
> conspiracy, i.e., phrased in the
> disjunctive.  However, both findings are
> required.

Respondent concedes, based on <u>Ireland</u> and
<u>Chun</u>, that the trial court erred in
instructing the jury on felony murder based
on assault by means of force likely to
produce great bodily injury or assault with a
deadly weapon under section 245.  However,
respondent contends the error was harmless
beyond a reasonable doubt based on the facts
of this case.

<u>Martinez</u>, 2013 WL 136183, at *7-8 (footnote in original).

The Court of Appeal then explained the prejudice analysis

United States District Court
Northern District of California

set forth in <u>Chun</u>, and compared it to Petitioner's case, as

follows:

> "Instructional error regarding the elements
> of the offense requires reversal of the
> judgment unless the reviewing court concludes
> beyond a reasonable doubt that the error did
> not contribute to the verdict." (<u>Chun</u>, 45
> Cal. 4th at 1201.)  <u>Chun</u> explained that,
> where the jury has been instructed with both
> a legally adequate and a legally inadequate
> theory, e.g., a valid malice murder theory
> and an invalid second degree felony murder
> theory, "to find the error harmless, a
> reviewing court must conclude, beyond a
> reasonable doubt, that the jury based its
> verdict on a legally valid theory, i.e.,
> either express or conscious-disregard-for-
> life malice." (<u>Id.</u> at 1203.)  Finally, <u>Chun</u>
> stated that the reviewing court can find the
> instructional error harmless only if "other
> aspects of the verdict or the evidence leave
> no reasonable doubt that the jury made the
> findings necessary for conscious-disregard-
> for-life malice. . . ." (<u>Id.</u> at 1205.)
>
> The prejudice analysis in <u>Chun</u> is
> instructive.  There, the evidence showed that
> shots were fired from one car, a Honda, into
> another, a Mitsubishi, when both were stopped
> at a stoplight.  At least six bullets were
> fired from three different guns.  All three
> occupants in the Mitsubishi were struck by
> bullets; one person was killed.  The
> defendant admitted to being in the backseat
> of the Honda; he identified the driver and
> said there were two others in the car.  In a
> second statement, the defendant admitted to
> firing a gun during the incident but claimed
> he did not point the gun at anyone and just
> wanted to scare the victims.  The jury found
> that the defendant was an active participant
> in a criminal street gang and that the
> shooting was committed for the benefit of the
> gang.  (<u>Chun</u>, 45 Cal. 4th at 1179-1180.)  The
> erroneous felony murder instruction given to
> the jury in <u>Chun</u> "required the jury to find
> that defendant had the specific intent to
> commit the underlying felony of shooting at
> an occupied vehicle.  Later, it instructed
> that to find defendant committed that crime,
> the jury had to find these elements: '1. A
> person discharged a firearm at an occupied
> motor vehicle; and 2. The discharge of the
> firearm was willful and malicious.'" (<u>Id.</u> at

1205.)

Based on the facts and the jury instructions, the court found that the invalid felony murder instruction was harmless. It explained: "[A]ny juror who relied on the felony-murder rule necessarily found that defendant willfully shot at an occupied vehicle. The undisputed evidence showed that the vehicle shot at was occupied by not one but three persons. The three were hit by multiple gunshots fired at close range from three different firearms. No juror could have found that defendant participated in this shooting, either as a shooter or as an aider and abettor, without also finding that defendant committed an act that is dangerous to life and did so knowing of the danger and with conscious disregard for life—which is a valid theory of malice. In other words, on this evidence, no juror could find felony murder without also finding conscious-disregard-for-life malice. The error in instructing the jury on felony murder was, by itself, harmless beyond a reasonable doubt." (Chun, 45 Cal. 4th at 1205.)

Here, the jury found "not true" the allegation that appellant personally and intentionally discharged the firearm, and rejected the seventh overt act alleged in the conspiracy count, i.e., that appellant was the shooter. The evidence showed that there was one gun used by one shooter. Thus, appellant's second degree murder conviction was based on aiding and abetting or being a co-conspirator, and not on his being the perpetrator of the fatal shooting. The only overt acts found by the jury were that appellant was at the upstairs party with other Sureños and that he told the others that someone downstairs was wearing red. There was no evidence that appellant or anyone else knew that Garcia had a gun that night or that he habitually carried a firearm, and no evidence that anyone at the upstairs party said anything about shooting or killing the individual who was downstairs wearing red. Ingrid Martinez testified that the most she was expecting was a fist fight.

As in Chun, the court here instructed on both implied malice murder and felony murder. (Chun, 45 Cal. 4th at 1202–1203.) However, unlike the felony murder instruction in Chun, here the court's instruction did not require

proof that appellant had the specific intent
to commit or aid in committing the crime of
shooting into an occupied vehicle.  Rather,
all it required was proof that appellant
committed or aided in committing the crime of
assault by means of force likely to produce
great bodily injury and/or assault with a
deadly weapon.  The court's instruction on
the elements of those crimes required proof
that (1) "a person was assaulted;" and (2)
"the assault was by means of force likely to
produce great bodily injury or with a
firearm."  There was no requirement, as in
Chun, that to find appellant guilty of second
degree felony murder, the jury had to find
that he acted with the knowledge and intent
that a willful and malicious shooting at
close range would take place, a finding that
necessarily included a conscious disregard
for life. (Chun, 45 Cal. 4th at 1205.)  By
contrast, here the jury could have applied
the invalid felony murder instruction to
convict appellant of second degree murder
based on finding that he intended to aid in
an aggravated assault, with no subjective
belief that it would endanger someone's life.

Martinez, 2013 WL 136183, at *8-9.

The Court of Appeal then found that Petitioner did not

suffer prejudice from the erroneous jury instruction because the

jury also received instructions that it could find Petitioner

guilty of murder as an aider and abettor of the assault under the

natural and probable consequences doctrine and, based on the

evidence presented, the jury found him guilty under this doctrine

beyond a reasonable doubt.  The court reasoned as follows:

"The natural and probable consequences
doctrine  FN5  provides that: '[An aider and
abettor] is guilty not only of the offense he
intended to facilitate or encourage, but also
of any reasonably foreseeable offense
committed by the person he aids and
abets....It follows that a defendant whose
liability is predicated on his status as an
aider and abettor need not have intended to
encourage or facilitate the particular
offense ultimately committed by the
perpetrator.  His knowledge that an act which
is criminal was intended, and his action

16

taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator.  It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which  . . . must be found by the jury.'  Thus,. . . a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the "natural and probable consequence" of the target crime." (People v. Prettyman, 14 Cal. 4th at 261.)

FN5  The natural and probable consequences doctrine is applied in cases involving the liability of conspirators for substantive crimes committed in the course of a conspiracy and the liability of aiders and abettors.  (See People v. Prettyman (1996) 14 Cal. 4th 248, 260-261, and cases cited therein.)

"Aider and abettor culpability under the natural and probable consequences doctrine for a nontarget, or unintended, offense committed in the course of committing a target offense has a different theoretical underpinning than aiding and abetting a target crime.  Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator to commit the target offense.  By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all.  It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense.  (People v. Garrison (1989) 47 Cal. 3d 746, 778 [accomplice liability is vicarious].)  Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.  It follows that the aider and abettor will

always be 'equally guilty' with the direct perpetrator of an unintended crime that is the natural and probable consequence of the intended crime." (People v. Canizalez (2011) 197 Cal. App. 4th 832, 851-852.)

Moreover, "the natural and probable consequences doctrine operates independently of the second degree felony-murder rule. (People v. Culuko (2000) 78 Cal. App. 4th 307, 322.) The natural and probable consequences doctrine does not merge all assaults into the felony-murder rule. Rather, it is a theory of liability for murder that applies when the assault has the foreseeable result of death. For aider and abettor liability, it is the intention to further the acts of another that creates criminal liability and not the felony-murder rule. (People v. Brigham (1989) 216 Cal. App. 3d 1039, 1052-1054.)" (People v. Karapetyan (2006) 140 Cal. App. 4th 1172, 1178.)

According to respondent, because the intended crime was not simple assault, but rather was aggravated assault—assault with force likely to produce great bodily injury or assault with a deadly weapon—the jury necessarily would have found that Mendoza-Lopez's murder was a natural and probable consequence of the assault. Based on the evidence and the jury's verdicts, a principal, i.e., Garcia, intentionally discharged a firearm, killing Mendoza-Lopez, with no mitigating circumstances. Although appellant was not the shooter, he was found guilty of second degree murder and conspiracy to commit aggravated assault. The target offense was aggravated assault, and the jury necessarily found that appellant intended to commit the target offense.

Our Supreme Court has addressed the dangerousness of gang-related conflicts. (People v. Medina (2009) 46 Cal. 4th 913. An act is dangerous to life for the purposes of malice where there is a high probability that it will result in death. (See People v. Patterson (1989) 49 Cal. 3d 615, 626-627.) Medina involved a gang fist fight, after which one of the co-defendants shot and killed the rival gang member. (Medina, 46 Cal. 4th at 917.) The gunman and his co-defendants were convicted of murder. The court stated that "a natural and probable

18

consequence is a foreseeable consequence.
. . ." (Id. at 920.)  Liability under the
natural and probable consequences doctrine
attaches if "a reasonable person in the
defendant's position would have or should
have known that the charged offense was a
reasonably foreseeable consequence of the act
aided and abetted."  (Ibid.)

In Medina, the court also discussed the
foreseeability of firearm use by gang
members: "Prior knowledge that a fellow gang
member is armed is not necessary to support a
defendant's murder conviction as an aider and
abettor." People v. Montes (1999) 74 Cal.
App. 4th 1050, 1056 (given the great
potential for escalating violence during gang
confrontations, it is immaterial whether
[defendant] specifically knew [fellow gang
member] had a gun);. . . People v. Godinez
(1992) 2 Cal. App. 4th 492, 501, fn.5
("although evidence indicating whether the
defendant did or did not know a weapon was
present provides grist for argument to the
jury on the issue of foreseeability of a
homicide, it is not a necessary
prerequisite)" (Medina, 46 Cal. 4th at 921.)

Here, where the jury found appellant guilty
under an aiding and abetting theory, he was
properly found guilty of murder under the
natural and probable consequences doctrine
because of the heightened potential for gun
violence with gangs and because of the
foreseeability of someone being killed.  (See
Medina, 46 Cal. 4th at 921.)  The trial court
instructed the jury on the prosecutor's
burden to prove every element of every
offense beyond a reasonable doubt and natural
and probable consequences, and the prosecutor
argued natural and probable consequences to
the jury.  The evidence showed that appellant
and Garcia approached the victim followed by
several others, rushed downstairs and
confronted him about wearing red clothing.
The shooter fired several times at close
range with two of the bullets striking the
victim and killing him.  There was no
evidence of any mitigating circumstance such
as any form of self-defense or heat of
passion.  At a minimum, the shooter evinced
implied malice, and appellant was held
vicariously liable for the foreseeable
consequence of the violent assault.  (See
Medina, 46 Cal. 4th at 920; People v.
Canizalez, 197 Cal. App. 4th at 851–852.)

1

2   <u>Martinez</u>, 2013 WL 136183, at *11-12 (footnote in original).

3   II. Federal Authority

4        A determination that there is a reasonable likelihood that

5   the jury has applied the challenged instruction in a way that

6   violates the Constitution establishes only that an error has

7   occurred.  <u>Calderon v. Coleman</u>, 525 U.S. 141, 146 (1998).  If an

8   error is found, the court also must determine that the error had

9   a substantial and injurious effect or influence in determining

10  the jury's verdict, <u>see</u> <u>Brecht</u>, 507 U.S. at 637, before granting

11  relief in habeas proceedings.  <u>Calderon</u>, 525 U.S. at 146-47.

12  Under AEDPA, a federal habeas court need not determine whether

13  the state court's harmlessness determination on direct review,

14  which is governed by the "harmless beyond a reasonable doubt"

15  test set forth in <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967),

16  was contrary to or an unreasonable application of clearly

17  established federal law.  <u>Fry v. Pliler</u>, 551 U.S. 112, 119-20

18  (2007); <u>Brecht</u>, 507 U.S. at 637 (on collateral review, the

19  <u>Chapman</u> beyond a reasonable doubt standard of prejudice must give

20  way to the less onerous standard of whether the error had a

21  substantial and injurious effect or influence in determining the

22  jury's verdict).[3]  However, no case forbids a federal habeas court

23  from applying AEDPA to the state court's harmlessness conclusion

24  to determine whether it was contrary to or an unreasonable

25  _____

26  [3]Previously, in <u>Mitchell v. Esparza</u>, 540 U.S. 12 (2003), the
    Supreme Court held that, when a state court determined a

27  constitutional violation was harmless, a federal court could not
    award habeas relief unless the harmlessness determination itself
    was unreasonable under 28 U.S.C. § 2254(d)(1); thus, the state

28  <u>Chapman</u> harmlessness determination was to be analyzed within the
    statutory provisions of AEDPA.

United States District Court
Northern District of California

application of clearly established law, and a number of Ninth Circuit cases have used this method.  See, e.g., Ponce v. Felker, 606 F.3d 596, 606 (9th Cir. 2010)(finding no prejudice under Brecht and because state court's determination of no prejudice was not contrary to or unreasonable application of established federal authority); Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004) (in applying the "unreasonable application" clause of § 2254(d)(1), habeas court may determine whether state court's harmless error analysis under Chapman was objectively unreasonable under AEDPA).

III. Analysis

Taking into consideration the evidence, instructions and jury findings of this case, the Court of Appeal found that the instructional error was harmless beyond a reasonable doubt, under the Chapman standard.  Martinez, 2013 WL 136183, at *12.  The Court of Appeal's finding of no error was not objectively unreasonable.  Furthermore, upon an independent review of the record, the Court finds that the error was harmless under Brecht.

Although the jury was given the erroneous felony murder instruction, it also was given an instruction that Petitioner could be an aider and abettor of the target crime of aggravated assault, that is, assault with force likely to produce great bodily injury or assault with a deadly weapon, and could be found guilty, not only of the target crime, but of any crime committed by the principal which was a natural and probable consequence of the target crime.  13 Reporter's Transcript (RT) 2411-12.  The relevant jury instructions were as follows:

A person aids and abets the commission of a

United States District Court
Northern District of California

crime when he or she, with knowledge of the
unlawful purpose of the perpetrator and with
the intent or purpose of committing or
encouraging or facilitating the commission of
the crime and by act or advice, aids,
promotes, encourages or instigates the
commission of the crime.  Mere presence at
the scene of the crime which does not itself
assist in the commission of the crime does
not amount to aiding and abetting.  Mere
knowledge that a crime is being committed and
the failure to prevent it do not amount to
aiding and abetting.

One who aids and abets in the commission of a
crime is not only guilty of that crime, but
is also guilty of any other crime committed
by a principal which is a natural and
probable consequence of the crime originally
aided and abetted.

In order to find the defendant guilty of the
crime of murder as charged in Count 1 under
an aiding and abetting theory, you must be
satisfied beyond a reasonable doubt that:
The crime of assault with force likely to
produce great bodily injury or the crime of
assault with a deadly weapon was committed;
that the defendant aided and abetted one of
those crimes; that a co-principal in a crime
committed the crime of murder; and the crime
of murder was a natural and probable
consequence of the commission of the crime of
assault with force likely to produce great
bodily injury or assault with a deadly
weapon.

In determining whether a consequence is
natural and probable, you must apply an
objective test based not on what the
defendant actually intended but on whether a
person of reasonable and ordinary prudence
would have expected likely to occur.

The issue is to be decided in light of all of
the circumstances surrounding the incident.
A natural consequence is one which is within
the normal range of outcomes that may be
reasonably expected to occur if nothing
unusual has intervened.

"Probable" means likely to happen.

13 RT 2412-13.

In his closing argument, the prosecutor argued that there

22

were three theories under which the jury could find Petitioner guilty of the murder of Mendoza-Lopez.  One of these was finding that the murder was a natural and logical consequence of Petitioner's aiding and abetting the principal in the crime of assault with force likely to produce great bodily injury or the crime of assault with a deadly weapon.  13 RT 2452-56; 2462.

The Court of Appeal summarized the jury's findings: (1) Petitioner was not the shooter; (2) he was found guilty of second degree murder and conspiracy to commit aggravated assault; and (3) the jury necessarily found that Petitioner intended to commit the target offense of aggravated assault.[4]  Martinez, 2013 WL 136183, at *11.  Because the jury was instructed that it could find Petitioner guilty of murder through the natural and logical consequence doctrine and the prosecutor argued it to the jury, the question is, whether the evidence supports a finding by the jury that Petitioner was guilty of murder through this doctrine, beyond a reasonable doubt.

The evidence shows that, on January 26, 2008, Petitioner was at a party with many people who were both upstairs and downstairs.  Petitioner, who was a member of a street gang, ran upstairs to inform his companions that Mendoza-Lopez, who was downstairs, was wearing red, the color of a rival gang.  The Petitioner went back downstairs with Garcia and other companions to confront Mendoza-Lopez about wearing red clothing in Richmond.

---

[4]As discussed previously, although the jury was instructed to return a finding on whether it found Petitioner guilty of conspiracy to commit murder or conspiracy to commit aggravated assault, it did not do so.  The trial court declared the target offense to be the lesser offense of aggravated assault.  13 RT 2563-66; 2577-78.

Then, Garcia, who was standing next to Petitioner and directly in front of Mendoza-Lopez, intentionally discharged a firearm, three times, at Mendoza-Lopez, killing him.  No evidence suggests the existence of mitigating circumstances such as Garcia acting in self-defense, imperfect self-defense or in the heat of passion. This evidence supports the jury's finding, beyond a reasonable doubt, that Petitioner aided and abetted Garcia, at the very least, in the target offense of aggravated assault.  Petitioner does not dispute this finding.  The evidence also shows that Garcia demonstrated the implied malice necessary for a finding that he committed murder.  The key issue is whether the evidence supports the finding that the murder was the natural and logical consequence of the aggravated assault.

Although no evidence showed that Petitioner or anyone else knew that Garcia was in possession of a firearm at the party, ample evidence about the possession of firearms by Petitioner and his gang members and about gang murders of rival gang members supported a finding that Mendoza-Lopez's murder was the natural and logical consequence of an aggravated assault on a suspected rival gang member.  See Medina, 46 Cal. 4th at 921 (prior knowledge that fellow gang member is armed not necessary to support murder conviction as aider and abettor)

This evidence consists of the following:  From Petitioner's vehicle, the police recovered numerous photographs of Petitioner holding a semiautomatic firearm and pistols and making a gang sign.  5 RT 948-52.  From Petitioner's bedroom, police recovered numerous live .357 magnum handgun rounds.  6 RT 1079, 1084, 1086. Gang member Cervantes testified that in 2007 and 2008, Sureno

24

United States District Court
Northern District of California

gang members were killing Nortenos to increase recruitment.  7 RT 1337-38; 1340.  Gang member Frank Rubalcava testified that murders were part of the Sureno gang culture.  8 RT 1425; 1427-28.  Gang member Jorge Sanchez testified that guns were used to protect the Surenos' drug territory and were used to attack Nortenos.  9 RT 1454.  He described the shooting and killing of three Nortenos by Surenos in December 2007.  9 RT 1475; 1500-14.

This evidence of firearm possession by Petitioner and other Sureno gang members and gun violence by Sureno gang members supports the jury's finding, beyond a reasonable doubt, that the murder of Mendoza-Lopez was the natural and probable consequence of the aggravated assault on Mendoza-Lopez, a suspected rival gang member.  Because Petitioner aided and abetted the aggravated assault of Mendoza-Lopez, he was guilty also of his murder.  See People v. Mendoza, 18 Cal. 4th 1114, 1133 (1998) (the question is not whether the aider and abettor actually foresaw the additional crime, but whether, looked at objectively, it was reasonably foreseeable).  Therefore, based upon the evidence, all of the jury instructions and the jury's findings, any error in the felony-murder instruction did not have a substantial and injurious effect or influence on the jury's verdict.

Petitioner argues that finding him guilty of murder through the natural and logical consequences doctrine does not comply with the California Supreme Court's specific prejudice standard set out in Chun, 45 Cal. 4th at 1203.  He argues that, under Chun, when the jury receives erroneous second degree felony-murder instructions, the instructions can only be deemed harmless if the reviewing court concludes, beyond a reasonable doubt, that

United States District Court
Northern District of California

the jury based its finding of second degree murder on either express or implied malice, an element of the crime of murder. Petition at 38.  This argument fails for two reasons.  First, on habeas review, this Court is not bound by the state standard for finding prejudice.  See Fry, 551 U.S. at 119-20.  Second, the Court of Appeal acknowledged that Petitioner could not be found guilty of second degree murder under the reasoning in Chun; that is why it continued its analysis under the alternate theory of the natural and logical consequences doctrine, under which Petitioner could be found guilty of murder without a finding of express or implied malice.

Petitioner next argues that the Court of Appeal unreasonably relied on Medina, 46 Cal. 4th at 916, which was a sufficiency of evidence case, to conclude Mendoza-Lopez's murder was the inevitable foreseeable outcome of the assault.  Petition at 39-42.  This argument fails for a number of reasons.  First, Medina is particularly applicable to this case.  It addressed whether sufficient evidence supported the jury's murder convictions of two aiders and abettors of an assault involving rival gang members on the theory that the murder was a reasonably foreseeable consequence of the assault.  Id.  Although Medina was a sufficiency of the evidence case and not a case determining whether an erroneous jury instruction was prejudicial, its findings and reasoning are useful in this case which also poses the question of whether a murder was a reasonably foreseeable consequence of an assault.

Second, the Court of Appeal opinion did not conclude that Medina stands for the "proposition that the convictions of the

26

aiders and abettors automatically or inevitably followed from
their complicity in the assault," as Petitioner argues.  Petition
at 39.  The Court of Appeal cited Medina to show the California
Supreme Court had addressed the dangerousness of gang-related
conflicts and had found that, in certain circumstances, firearm
use by gang members is a foreseeable consequence of gang
conflicts.  Martinez, 2013 WL 136183, at *11-12.  The Court of
Appeal then applied Medina to the evidence presented at
Petitioner's trial to conclude that the jury reasonably held
Petitioner vicariously liable for the foreseeable consequence of
the violent assault on Mendoza-Lopez.  Id. at *12.

     Third, as discussed above, sufficient evidence about gang
members using firearms and murdering rival gang members was
presented in this case to support the finding that Mendoza-
Lopez's murder was the natural and logical consequence of the
aggravated assault.

     Petitioner next argues that a finding that murder is the
natural and probable consequence of assault when gangs are
involved would create the same problem Chun rejected, that a
murder conviction would always result from a conviction for
aiding and abetting an assault where the victim died.  The Court
of Appeal rejected this argument explaining that "the natural and
probable consequences doctrine does not merge all assaults into
the felony-murder rule.  Rather, it is a theory of liability for
murder that applies when the assault has the foreseeable result
of death.  For aider and abettor liability, it is the intention
to further the acts of another that creates criminal liability
and not the felony-murder rule." Martinez, 2013 WL 136183, at

United States District Court
Northern District of California

*11.  This Court must defer to the state's interpretation of its own laws.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); see also Bueno v. Hallahan, 988 F.2d 86, 88 (9th Cir. 1993) (federal habeas courts must defer to state courts' interpretations of their own state laws).

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

No certificate of appealability is warranted in this case. See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of appealability in same order that denies petition).  Petitioner has failed to make a substantial showing that his claim amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claim debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: 06/04/2015

_____
CLAUDIA WILKEN
United States District Judge